UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LARRY ORR,                          )
                                    )
            Plaintiff,              )
                                    )
      v.                            )      No. 4:07 CV 1751 ERW
                                    )                      DDN
MICHAEL J. ASTRUE, Commissioner )
of Social Security,                 )
                                    )
            Defendant.              )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final
decision of defendant Commissioner of Social Security denying the
application of plaintiff Larry Orr for disability insurance benefits and
supplemental security income under Titles II and XVI of the Social
Security Act (Act), 42 U.S.C. §§ 401, et seq., and 1381, et seq. The
action was referred to the undersigned United States Magistrate Judge for
review and a recommended disposition under 28 U.S.C. § 636(b). For the
reasons set forth below, the undersigned recommends that the ALJ's
decision be affirmed.

**I. BACKGROUND**

Plaintiff Larry Orr filed two applications under the Act, an August
6, 2004 application for disability insurance benefits under Title II (Tr.
42-44), and an October 18, 2006 application for supplemental security
income (SSI) under Title XVI. (Tr. 58.) Orr alleged an onset date of
disability of August 30, 2000 (Tr. 42.), subsequently amended to October
19, 2004. (Tr. 282, 58.) The claim was denied. (Tr. 27-31.) Orr

requested a hearing, appealing directly to the ALJ.[1] (Tr. 22-23.) (Tr. 58.)

On December 7, 2006, following a hearing, the ALJ found Orr not disabled. (Tr. 10-21.) Orr requested review by the Appeals Council. (Tr. 9.) On August 10, 2007, the Appeals Council denied his request for review. (Tr. 5-7.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL HISTORY

Orr was born on June 17, 1961. (Tr. 42.) He dropped out of highschool and has a GED. (Tr. 121.) On September 21, 2004, at defendant's request, Orr was given a psychological evaluation at the University of Missouri, St. Louis. (Tr. 119-127.) Orr reported several hospitalizations for psychiatric and substance abuse problems, starting with a hospitalization at Missouri Baptist Hospital at age 17 for depression. (Tr. 120.) In 1979 he was admitted to Hyland Center for alcohol abuse treatment. (Id.) In 1981 Orr suffered a head injury in a car accident, since which time he has complained of short term memory loss, muscle weakness, and low motivation. (Id.) Since 1981 Orr has been hospitalized for substance abuse disorders on at least four occasions--including twice by court order--and has been involved in various twelve-step programs. (Id.)

At the September 2004 evaluation, Orr stated that he drank about once a week, usually a twelve pack of beer or one half to a full bottle of vodka, and that he usually drank to "forget" and for depression. (Tr. 120-21.) Orr is a pack-a-day cigarette smoker. (Id.) The examiner reported that Orr sustained an adequate level of effort and concentration, and that the testing performed was believed to be valid estimates of his cognitive and memory functioning. (Tr. 122-23.) Orr

---

[1]Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case. 20 C.F.R. §§ 404.906, 404.966, 416.1406, 416.1466 (2007). These modifications include, among other things, the elimination of the reconsideration step. See id.

obtained IQ scores of 106 verbal, 99 performance, and 103 full scale, average scores. (Tr. 123.)

On the Trail Making Test,[2] Orr's performance was suggestive of mild deficits on a task that requires spatial organization, graphomotor[3] speed, planning, and task persistence/vigilance. (Id.) Orr's general memory functioning was in the borderline range, significantly weaker than expected given his cognitive ability. (Id.) Orr exhibited "mild to moderate difficulties storing, encoding, and recalling auditory information." (Tr. 124.) Orr also reported being depressed. His performance on the Beck Depression Inventory was consistent with the presence of serious depressive symptoms. (Id.) Orr was diagnosed with major depressive disorder (recurrent, moderate) and alcohol abuse. (Id.) The examiner assigned a Global Assessment of Functioning (GAF) score of 57.[4] (Id.) In addition to concluding that Orr had mild deficits in social functioning, the examiner concluded that Orr's concentration and attention appeared intact and that he could follow both simple and complex instructions. (Tr. 124-25.)

On August 6, 2004, Orr was interviewed at the agency field office by Nancy Wojcicki. (Tr. 59-61.) Wojcicki observed that Orr was wearing clean clothes, but that his hair and nails were not well kept, he was missing several teeth, and came across as "being mentally slow." Wojcicki indicated Orr had difficulty with understanding. (Tr. 60.) Orr's former brother-in-law, who had driven Orr to the office, stated that Orr had always been supported by his parents, both of whom were now deceased. (Id.) Orr's brother-in-law also stated that Orr's longest

---

[2]The Trail Making Test is a neuropsychological test used to determine the effects of brain damage on behavior. Stedman's Medical Dictionary 177 (25th ed. 1990).

[3]This relates to the movements used in writing. Id. at 670.

[4]A GAF of 51-60 indicates moderate symptoms (e.g., flat effect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000). (DSM-IV-TR)

employment was with a company that had employed Orr's mother, and "that's probably how he got and stayed employed with them." (Id.)

On August 12, 2004, Orr completed a telephonic Employee Work Activity Report after he attempted to work after his initial alleged onset date of August 30, 2000. (Tr. 70-76.) Orr reported that he worked at the Macaroni Grill between July and November 2001 washing dishes, preparing food, and bussing tables, but that he was terminated in November 2001 because he had difficulty following directions and remembering job assignments. (Tr. 71.) The report notes that Orr had one work attempt after his alleged onset date; that he earned an average of $489 per month and worked for only four months; and that his work attempt did not represent Substantial Gainful Activity. (Tr. 76.)

On his Work History Report, Orr indicated that he had worked as a dishwasher from September to December 2000 (walked 7-8 hours, stood 11 hours, sat 5 minutes, lifted "20 lbs." at most, and frequently lifted "25 lbs." per day); as an adult day care assistant at the Jewish Community Center from July 1997 until March 1998 (walked 3 hours, stood 3 hours, sat 1 hour, lifted less than 10 lbs. at most, and frequently lifted less than 10 lbs. at most per day); at D & W partnership, an apartment complex, as a building engineer in 1997 (walked 4 hours, stood 4 hours, lifted 20 lbs. at most, and frequently lifted 10 lbs. per day); and as a trainee at Goodwill in 1997 (walked 8 hours, stood 8 hours, lifted 20 lbs. at most, and frequently lifted 10 lbs. per day). (Tr. 77-85.)

On August 17, 2004, Orr completed a Function Report. He reported that he used to have better memory and strength; that he had difficulty sleeping; and that he lost his drivers license ten years ago and no longer drove. He also reported no problems with personal care, and that he was able to do house and yard work, prepare his own meals, grocery shop, handle his finances, and engage in hobbies and interests. (Tr. 95-102.)

On August 18, 2004, Peter Hopp, a friend of Orr's for seven years, completed a Third Party Function Report. Hopp stated Orr had difficulty sleeping, described as an inability to get to sleep until late night and early morning waking. Hopp also reported that Orr lived alone and had no problems with personal care. (Tr. 86-87.)

On October 15, 2004, Terry L. Dunn, Ph.D., a non-treating, non-examining state agency psychologist, completed a Psychiatric Review Technique Form, concluding that Orr had a recurrent and moderate major depressive disorder and an alcohol abuse disorder. (Tr. 127, 130, 135.) In a mental residual functional capacity (RFC) assessment the same day, Dunn opined that Orr suffered moderate limitations in the abilities to understand and remember detailed instructions, in the ability to carry out detailed instructions, and in the ability to maintain attention and concentration for extended periods. (Tr. 155.)

On October 19, 2004,[5] Orr, who was homeless at the time, was admitted as a walk-in patient at St. John's Mercy Medical Center for depression and possible suicidal thoughts. (Tr. 161-204.) He was diagnosed with depression (not otherwise specified) and polysubstance abuse (cocaine and alcohol), and assigned a GAF score of 55-60. (Tr. 162.) He was prescribed Zoloft (anti-depressant), Seroquel (mood stabilizer), and Klonopin (for treatment of panic disorder). (Tr. 163-64.) Orr was encouraged to seek outpatient chemical dependence treatment and use coping skills to better deal with stress. (Tr. 188.) He was discharged the following day. (Tr. 160.)

On March 2, 2005, Orr was seen by Dr. M. Marcu at the St. Patrick's Center (St. Patrick's Center). Marcu diagnosed polysubstance dependence (in short remission) and depression (not otherwise specified), and restarted Orr on Zoloft and Seroquel. Orr was encouraged to attend AA meetings. (Tr. 206-12.)

On March 30, 2005 Orr returned to St. Patrick's Center for follow up, at which time he reported that, although he was still depressed, he was feeling better, with improved mood and energy, and that he had not used cocaine or alcohol for four months. Orr was now working at McMurphy's Grill, a restaurant associated with St. Patrick's Center. Dr. Marcu increased his Zoloft, discontinued his Seroquel, and prescribed Trazodone for insomnia. (Tr. 208.)

On April 27, 2005, Orr saw Dr. Marcu again, at which time Orr reported feeling better. (Id.) In addition to taking his medications,

---

[5]This is Orr's amended alleged disability onset date.

Orr was still working at McMurphy's, living at the Salvation Army, and participating in long term substance abuse treatment. (Id.) Upon follow-up in May, Orr reported that he was not drinking, was taking his medications regularly, and was doing even better, although he still rated his depression "7" on a scale of 1 to 10. (Tr. 209.)

On June 22, 2005, Orr was seen at St. Patrick's Center by Jothika Manepalli, M.D., a psychiatrist, at which time he reported doing fairly well on his medication, and rated his sleep, appetite, and mood all fair. (Tr. 210.) Orr was not working at the time and was looking for a job. (Id.) He reported about six months of sobriety. (Id.)

By July 27, 2005, when seen for follow-up, Orr was working at the Renaissance Hotel. (Tr. 211.) He reported occasional symptoms such as hopelessness and anxiety, but was generally "OK." (Id.) His Trazodone was increased to assist with increased stress brought on by having to move out of the Salvation Army. (Id.)

On September 2, 2005, Orr was seen at Saint Louis University Hospital (SLU) Emergency Room for a severe right eye injury from an assault in a downtown St. Louis park. (Tr. 215-20.) During the assault, Orr's right eye had been struck with an umbrella, rupturing the globe. (Tr. 216-17, 220, 242.) Orr's right eye globe was enucleated (removed), and a prosthetic eye was put in place. (Tr. 225.)

On September 10, 2005, Orr returned to SLU for assistance with placement of his prosthetic eye which had fallen out after he was punched in the eye that night. (Tr. 223-25.) At that time, Orr reported pain at a level of seven out of ten. (Tr. 225.)

On September 14, 2005, Orr was seen at St. Patrick's Center - BJC Behavioral Health at which time he was depressed and struggling to adjust to his physical limitations following his assault. (Tr. 268.)

In a Disability Report dated September 15, 2005, Orr listed a 1981 head injury as the condition that limited his ability to work. He reported that due to the head injury, "I have memory problems. I don't have as much strength as I used to," and that since then it has affected his work, causing him to work fewer hours and change his job duties. Orr attributed these adjustments to "tiredness" and "forgetfulness." He indicated that he stopped working at a restaurant because the work was

physically too difficult for him, and that before that he quit work in 2000 because his employer went out of business. (Tr. 62-63.)

On September 16, 2005, Orr was seen at SLU Eye Institute for a post-operation checkup, at which time he was still experiencing intermittent pain and itchiness of the right eye. A replacement conformer[6] was ordered. (Tr. 238-44.)

On October 7, 2005, Gabriela M. Espinoza, M.D., referred Orr to Bruce Cook, M.D., for a new prosthesis to preserve the health of his eye socket. (Tr. 237.)

On December 16, 2005, SLU Eye Institute records show that the bed of Orr's right eye orbit had healed, with excellent vascularization[7], and with no inflammation or mucous. At that time he had not yet received his new prosthesis, although the new conformer was in place. (Tr. 235-36.)

On March 1, 2006, Dr. Manepalli submitted a "Mental Medical Source Statement," concluding that Orr had marked functional limitations in areas of (1) maintaining reliability; (2) accepting instructions and responding to criticism; (3) understanding and remembering simple instructions; (4) maintaining regular attendance and being punctual; (5) maintaining his attention and concentration for extended periods; and (6) working in coordination with others. In all other areas of concentration, persistence, or pace; social functioning; and activities of daily living, other than the ability to function independently, Manepalli found that Orr had moderate functional limitation. (Tr. 230-33.)

Dr. Manepalli also reported that Orr had suffered at least four episodes of decompensation in the past year that had lasted at least two weeks. She opined that Orr suffered substantial losses of (1) the ability to understand, remember, and carry out simple instructions; (2) the ability to make judgments when performing even unskilled work; (3)

_____

[6]A conformer is a prosthesis mold, usually of plastic material, used in plastic surgical repair to maintain space in a cavity or to prevent closing by healing of an artificial or natural opening affected by neighboring surgical repair. Stedman's Medical Dictionary 342 (25th ed. 1990).

[7]The formation of new blood vessels in a part. Id. at 1690.

the ability to respond appropriately to supervision, co-workers, and normal work situations; and (4) the ability to deal with changes in a routine work setting. Dr. Manepalli concluded that all of Orr's recorded limitations had lasted at least twelve continuous months, or were expected to last at least twelve continuous months at the assessed level of severity. (Tr. 232.) Manepalli diagnosed polysubstance dependence, depression (not otherwise specified), arthritis, loss of his right eye, homelessness, and assigned a GAF score of 50[8] (as of March 2, 2005). (Tr. 233.)

BJC Behavioral Health records dated April 5, 2006 state that Orr's depression was better, but still comes and goes, and that he was in the process of applying for a job. At that time Orr appeared disheveled and unshaven. (Tr. 273.) By May 3, 2006, Orr appeared much better and reported his depression had improved. He had found a job and was very excited about that. (Id.) On May 3, 2006, Orr was assigned a GAF score of 50 to 60. (Tr. 274.)

On June 2, 2006, Orr saw Marla L. Placke, a Licensed Professional Counselor at BJC. (Tr. 255-63.) Placke diagnosed recurrent major depression, alcohol dependence, marijuana abuse/dependence and assigned a GAF score of 55. (Tr. 262.) She noted that Orr had repeatedly, albeit unsuccessfully, attempted to battle his alcohol and substance abuse problems by engaging in continuous and ongoing alcohol treatment through AA and other treatment centers. (Tr. 258.) Rao Kosuri, M.D., confirmed Placke's diagnosis, but with a GAF score of 60, about two weeks later. (Tr. 264-66.)

On June 9, 2006, L. Lynn Mades, Ph.D., a non-treating, consultative examiner, performed a mental examination of Orr. (Tr. 245-50.) Dr. Mades questioned Orr's compliance with his prescription medications, which then included Seroquel (mood stabilizer), Zoloft, and Trazodone. (Tr. 246.) Dr. Mades diagnosed alcohol dependence, polysubstance dependence, and depression. She opined that Orr's alcohol and substance

---

[8]A GAF of 41-50 is defined as serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV-TR at 34.

abuse likely contributed to his depression and mood impairment and that he also suffered moderate psychosocial and environmental problems due to his limited support system, as well as his legal and personal relationship problems. (Tr. 249.) She found that Orr had no problem understanding, remembering, or carrying out instructions, and other than a slight inability to respond appropriately to work pressure in a usual work setting, he had no problem responding appropriately to supervisors, co-workers, or work problems in a usual work setting. (Tr. 251-52.) Dr. Mades believed that Orr's alcohol and substance use contributed significantly to his mental limitations. (Tr. 252-53.) Mades assigned a GAF score of 75,[9] concluding his prognosis would be "fair" with abstinence from substance use. (Tr. 262.)

On September 19, 2006, Orr's attorney submitted a list of his medications, which then included Zoloft, Seroquel, and Trazodone. (Tr. 107-08.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on October 18, 2006. (Tr. 279-317.) Orr testified that he was 45 years old and that he lived alone in an apartment. (Tr. 284.) He testified that he had earned about 38 college credits at a community college, and that he last attended college more than five years ago. (Tr. 285.)

Orr testified that he had last worked as a cook at the Renaissance Grand Hotel from June to August 2005, but that he lost that job following his eye injury. (Id.) He testified that he had previously worked as a cook at McMurphy's Grill, a job he obtained through a training program run by St. Patrick's Center. (Tr. 285-86.) Orr testified he had worked previously as a part-time adult daycare worker at the Jewish Community Center Adult Services, a dishwasher at Macaroni Grill, a baker of bread

---

[9]Under a GAF score of 71-80, if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational or school functioning (e.g., temporarily falling behind in school work). DSM-IV-TR, 34.

and pastries, and a grounds worker at an apartment complex. (Tr. 287-90.)

Orr testified that his ability to work full time was inhibited by physical problems with his shoulder, elbow, and knee, which made it difficult for him to stand "for a while," but that he wasn't sure whether his physical problems would prevent him from working at a seated job on a full time basis. (Tr. 295.)

Orr testified that he was seeing a psychiatrist at BJC for depression; that he had been seeing another psychiatrist at St. Patrick's Center before that; and that he was currently taking Zoloft and Seroquel for his depression, which helped him somewhat. (Tr. 295-98.) Orr testified that he had memory problems and carried a notepad with him at all times to write things down; that he needed to read newspaper articles several times due to difficulty concentrating; and that he sometimes forgot what happened five minutes earlier due to his 1981 head injury. (Tr. 299, 306-07.)

Orr testified that his depression isolated him, and that he usually stayed home and watched television; that he had a friend who came over four or five times a week and who sometimes took him out to eat; that he read, but that it had gotten difficult to do so since he lost his eye; and that he did not have any particular hobbies other than reading, watching television, and cooking. (Tr. 303-05.)

Orr testified that the heaviest thing he had recently lifted was his clothes basket, which he carried next door to do his laundry; that lifting too much "gets to [him] after a little while"; and that walking was not a problem. (Id.)

Orr testified that he drank a beer in the month before the hearing; that he had received twice weekly outpatient treatment at St. Patrick's Center which he started a few years ago; that he was currently attending weekly AA meetings; and that he had not been drunk in a long time. (Tr. 290. 293-94, 307-8.)

Dr. W. Glenn White, a vocational expert, also testified at the hearing. The ALJ first asked White whether an individual of Orr's age, education, and work experience who was

limited to work, simple work, maybe simple and repetitive work . . . which did not require binocular vision . . . ,

> would there be work that could be performed either past work
> or other work?

The VE responded that there were assembler jobs at the sedentary level and the medium level. (Tr. 311-12.) The ALJ asked Dr. White whether an individual with the mental limitations assessed by Dr. Manepalli would be able to perform any jobs, to which VE White responded in the negative. (Tr. 313-14, 230-32).

### III. DECISION OF THE ALJ

On December 7, 2006, the ALJ issued an unfavorable decision. (Tr. 13-21.) The ALJ found that Orr had "probably" not performed substantial gainful activity since October 19, 2004, his amended alleged amended onset date. (Tr. 14.) The ALJ found that the medical evidence established that Orr had "severe" impairments, including a depressive disorder not otherwise specified, a history of substance abuse, and removal of his right eye. The ALJ concluded Orr had no impairment or combination of impairments that meets or equals in severity the requirements of a listing. (Tr. 15, 19.)

The ALJ found the March 1, 2005 form assessment completed by Dr. Manepalli was inconsistent with his treatment records from St. Patrick's Center, BJC, and Dr. Mades, and was therefore not credible. (Tr. 18.)

The ALJ considered the credibility of Orr's subjective complaints and determined that they were not fully credible in light of (1) the gap in treatment from 1982 through 2004; (2) the lack of medical evidence to show any physical impairments other than the loss of his right eye; (3) his good response to mental health treatment; (4) his intermittent noncompliance with his medical and mental health treatment; (5) his work record during his alleged period of disability; and (6) inconsistencies in his statements. (Tr. 15-18.)

The ALJ found the medical evidence established no chronic, long term physical impairment other than the loss of his right eye, which did not occur until August 2005. He found no medical evidence of any other chronic impairment involving the knees, elbows, shoulders, or any other spinal or joint area or other area of the body. He noted that, other

-11-

than his eye injury in August 2005, Orr had no surgery or in-patient hospitalizations for any physical problem since November 1982. He noted that no treating or examining physician had ever stated or implied that Orr was physically disabled or totally incapacitated, or that he had any significant long term exertional or other physical limitations or restrictions, apart from the obvious ones related to his binocular vision. The ALJ noted there was no evidence of any significant, uncontrollable adverse side effects from medications, and whatever adverse side effects Orr may have had at various times were presumably in all instances eliminated or at least greatly diminished by simple changes in medication or dosage. He found the medical evidence established no inability to walk or to perform fine and gross movements effectively on a sustained basis due to an underlying musculoskelatal impairment. (Tr. 18.)

The ALJ found that, although Orr had a history of substance abuse, there was no evidence that it was uncontrollable or that it ever interfered all that much with his ability to hold jobs, if at all, even though it has existed since 1982. (<u>Id.</u>) With respect to his depression, the ALJ found that, although Orr has received treatment for his depression since at least October 2004, it had apparently never much interfered with his ability to work. (<u>Id.</u>)

Regarding Orr's residual functional capacity, the ALJ found:

> no persuasive medical reason why [Orr] could not perform jobs at any and all levels of exertion, so long as they did not require him to do more than simple, repetitive tasks, and did not require full binocular vision ability.

(Tr. 17.) The ALJ restated Orr's RFC thus:

> 5. The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except probably for doing more than simple, repetitive tasks or jobs requiring full binocular vision. There are no credible, medically-established physical or other mental or other nonexertional limitations (20 CFR 416.945).

(Tr. 20.)

The ALJ found that Orr "probably" has no past relevant work in the past fifteen years. (Tr. 17, 20.) Referring to testimony of the

-12-

vocational expert, the ALJ found Orr was capable of performing other work existing in the national economy, and therefore Orr was not disabled. (Tr. 17, 19-20.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision. See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner finds that a claimant is disabled or not disabled at any step, a decision is made and the next step is not reached. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

## V. DISCUSSION

Orr argues the ALJ erred in (1) failing to evaluate the medical opinion evidence under the regulations; (2) making an RFC determination "of simple, repetitive tasks" because it does not capture the specific

limitations of his impairments; and (3) making an RFC determination that is not supported by substantial evidence, because the vocational expert's testimony does not provide substantial evidence in this instance.

## A.    Medical Opinion Evidence

Here, the ALJ properly considered the medical opinion evidence of record.  Orr's medical records include reports from several physicians, including Drs. Mades, Manepalli, Marcu, and others.  The record shows that on June 22, 2005, Orr was seen by Dr. Manepalli, at which time Orr reported doing "fairly well" on his medication, and rated his sleep, appetite, and mood all fair. (Tr.  210.) Orr was not working at the time and was looking for a job.  (Id.)  He reported about six months of sobriety.  (Id.)

In her March 1, 2006 "Mental Medical Source Statement," Dr. Manepalli concluded that Orr had marked functional limitations in areas of (1) maintaining reliability; (2) accepting instructions and responding to criticism; (3) understanding and remembering simple instructions; (4) maintaining regular attendance and being punctual; (5) maintaining his attention and concentration for extended periods; and (6) working in coordination with others.  (Tr. 230-33.)  In all other areas of concentration, persistence, or pace; social functioning; and activities of daily living, other than the ability to function independently, Dr. Manepalli found that Orr had moderate functional limitation.  (Tr. 230-31.)  Manepalli reported that Orr had suffered at least four episodes of decompensation in the past year that had lasted at least two weeks.  (Tr. 232.)

Dr. Manepalli opined that Orr suffered substantial losses in (1) the ability to understand, remember, and carry out simple instructions; (2) the ability to make judgments when performing even unskilled work; (3) the ability to respond appropriately to supervision, co-workers, and normal work situations; and (4) the ability to deal with changes in a routine work setting.  (Tr. 232.)  Manepalli concluded that all of Orr's recorded limitations had lasted at least twelve continuous months, or were expected to last at least twelve continuous months at the assessed level of severity.  (Tr. 232.)  Manepalli diagnosed polysubstance

dependence, depression (not otherwise specified), arthritis, Hepatitis C, loss of his right eye, homelessness, and a GAF score of 50 (as of March 2, 2005). (Tr. 233.)

Orr asserts the ALJ did not accord Dr. Manepalli's opinion the appropriate weight. The ALJ is required to assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record. 20 C.F.R. § 404.1527(d)(2). A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it. Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006). See 20 C.F.R. § 404.1527(d)(2). An ALJ may elect under certain circumstances not to give controlling weight to treating doctors' opinions. A physician's statement that is not supported by diagnoses based on objective evidence will not support a finding of disability. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight. Id.; see also Hacker, 459 F.3d at 937; 20 C.F.R. § 404.1527(d)(2). It is the ALJ's duty to resolve conflicts in the evidence. See Hacker, 459 F.3d at 936.

The ALJ found Dr. Manepalli's form assessment was inconsistent with Orr's treatment records from St. Patrick's Center, BJC, and Dr. Mades, and was therefore not credible. (Tr. 18.) Specifically, the ALJ noted Orr's treatment records from St. Patrick's Center, BJC, and Dr. Mades showed Orr's basic abilities to think, understand, communicate, concentrate, get along well with others, and handle normal work stress to have never been significantly impaired on any documented long term basis, nor had there been any documented serious deterioration in his personal hygiene or habits, daily activities, or interests, effective intelligence, reality contact, thought processes, memory, speech, mood and affect, attention span, insight, judgment, or behavior patterns over any extended periods of time. The ALJ further noted that at the hearing, Orr showed no obvious signs of depression, anxiety, memory loss, or other mental disturbance. (Tr. 18.)

The regulations specifically require the ALJ to assess the record as a whole to determine whether the treating physicians' opinions are inconsistent with other substantial evidence in the record. 20 C.F.R.

§ 404.1527(d)(2). Here, the ALJ did so and diminished the weight given Dr. Manepalli's opinion for proper reasons.

**B.    Residual Functional Capacity (RFC)**

Orr argues the ALJ erred in concluding only that he was limited to "simple, repetitive tasks." Orr argues this phrase describes only a "vocational conclusion," not an RFC. He argues that, while there were a few medical source opinions regarding plaintiff's capabilities, no medical evidence supports a limitation of his ability to simple, repetitive work.

In his reply brief, defendant argues that the ALJ's use of the phrase "simple, repetitive tasks" to describe Orr's RFC is proper because the Eighth Circuit endorsed the use of this language in hypothetical questions, citing <u>Goff v. Astrue</u>, 421 F.3d 785, 789, 791 (8th Cir. 2005); <u>Howard v. Massanari</u>, 255 F.3d 577, 582 (8th Cir. 2001); and <u>Brachtel v. Apfel</u>, 132 F.3d 417, 421 (8th Cir. 1997). In his reply brief, Orr takes issue with the defendant's invocation of these cases.

Orr argues that the court in <u>Goff</u> did not specifically address the adequacy of a limitation to "simple, repetitive work," but evaluated the plaintiff's claims that the ALJ failed to give sufficient weight to his treating physicians. The undersigned agrees. <u>Goff</u> addressed, among other issues, plaintiff's claim that the ALJ's hypothetical to the vocational expert was deficient because it failed to mention the claimant's depression, her degenerative joint disease, her obesity, her prior history of seizures, or her descriptions of severe pain during daily living activities. <u>Goff</u>, 421 F.3d at 794. While the Eighth Circuit's opinion does not quote the ALJ's hypothetical question to the Vocational Expert, it describes the ALJ's finding of the plaintiff's RFC as being able

> to perform work which was limited to lifting 10 pounds frequently and 20 pounds occasionally, and standing and/or walking no more than six hours of an eight-hour day. The ALJ determined Goff should avoid very complex and detailed work, but found she was capable of preforming **more than merely simple, routine, and repetitive work.**

<u>Goff</u>, 421 F.3d at 789 (emphasis added). The court held that the ALJ's finding that the claimant was capable of performing more than merely

simple, routine, and repetitive work properly included only those limitations supported by the record as a whole. By its use of the bolded phrase quoted above, the Eighth Circuit was not called upon to assess and did not approve that phrase as a legally sufficient finding of RFC in and of itself. Id. at 789, 794.

As to Howard and Brachtel, Orr argues that they were instances where the court evaluated the relationship between the Psychiatric Review Technique (PRT) and RFC. He argues that the point of Howard and Brachtel was that the PRT is not the same as RFC, and that an ALJ did not have to include the exact limitations expressed in the PRT in formulating a claimant's RFC. He argues that neither case had before it the issue of the inherent acceptability of a generic limitation to "simple repetitive work," such as the case at hand. Orr's argument is persuasive as to Brachtel but not as to Howard.

In Brachtel, the claimant argued the hypothetical failed to set forth impairments that even the ALJ himself accepted as existing. 132 F.3d at 420. On the "Psychiatric Review Technique Form" completed by the ALJ and which was attached to his decision, the ALJ indicated that the claimant would "often" manifest deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. Id. The claimant contended the hypothetical, which included the ability "to do only simple routine repetitive work, which does not require close attention to detail," and that claimant "should not work at more than a regular pace," did not take into account these impairments. Id. at 421. The court determined that adding to the finding that the claimant could "do only simple work" the further finding that the claimant was limited as to concentration and pace made the ALJ's findings sufficiently specific. Id.[10]

In Howard the issue was whether the hypothetical question posed to the vocational expert adequately addressed the limitations associated with the diagnosis of borderline intellectual functioning. In upholding

---

[10]The Eighth Circuit in Brachtel distinguished its earlier decision in Newton v. Chater, 92 F.3d 688 (8th Cir. 1996), because there the court reversed because the ALJ put into the hypothetical question to the VE only the finding that the claimant could do "simple jobs."

the ALJ's determination that the claimant was literate, and therefore not entitled to disability benefits, the court held that the hypothetical question need not have used specific diagnostic terms where the descriptive term used adequately defined claimant's impairments. 255 F.3d at 582. The court held the ALJ's hypothetical question concerning someone who was "capable of doing simple, repetitive, routine tasks" adequately captured the claimant's deficiencies in concentration, persistence or pace. Id. at 582.

RFC is a medical question and the ALJ's assessment of RFC must be supported by substantial evidence in the record. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). RFC is what a claimant can do despite his limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and a claimant's description of his limitations. Donahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R. § 416.945(a)(1)("Your residual functional capacity is the most you can still do despite your limitations."). While the ALJ is not restricted to medical evidence alone in evaluating the RFC, the ALJ is required to consider at least some evidence from a medical professional. Lauer, 245 F.3d at 704. Defendant has the burden of proof for an assessment of RFC that will be used to prove that a claimant can perform other jobs in the national economy. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000).

An "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at * 7 (Soc. Sec. Admin. July 2, 1996). RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence. Id.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." Singh, 222 F.3d at 452. If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in the record, the opinion should be given controlling weight. Id. A treating physician's opinions must be considered along with the evidence as a whole, and when a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight. See id.; Sampson v. Apfel, 165 F.3d 616, 618 (8th Cir. 1999). Thus, if other medical assessments are supported by superior medical evidence, the ALJ may discount the opinion of the treating physician. Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). However, the ALJ may not discredit a claimant solely because his subjective complaints are not fully supported by objective medical evidence. Ramirez v. Barnhart, 292 F.3d 576, 580-82 (8th Cir. 2002).

Here substantial medical record evidence supports the ALJ's assessed RFC ("The claimant has the residual functional capacity to perform the physical exertional and nonexertional requirements of work except probably for doing more than simple, repetitive tasks or jobs requiring full binocular vision.") (Tr. 20.) As discussed above, the ALJ's decision in this case demonstrates that he considered the entirety of the record evidence, including all of the medical evidence and testimony in assessing Orr's RFC. The ALJ found Orr's subjective complaints were not fully credible and properly discredited Dr. Manepalli's opinion. See Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006).

The undersigned concludes that the ALJ properly assessed Orr's RFC as it is expressed in his written decision.

## C.    Hypothetical Question to the Vocational Expert

Orr next argues that the ALJ erred by including a limitation of his RFC to simple, repetitive tasks in his hypothetical question to the vocational expert because it did not take into consideration all of his limitations. The SSA contends the ALJ posed proper hypothetical questions to the vocational expert. Specifically, the SSA contends, because the ALJ found Orr's subjective complaints were not fully credible and properly discredited Dr. Manepalli's opinion, the ALJ properly included only those limitations he found to be credible.

> It is well established that [q]uestions posed to a vocational
> expert should precisely set out the claimant's particular
> physical and mental impairments." Ledoux v. Schweiker, 732
> F.2d 1385, 1388 (8th Cir.1984)(quoting Tennant v. Schweiker,
> 682 F.2d 707, 711 (8th Cir.1982)); Totz v. Sullivan, 961 F.2d
> 727, 730 (8th Cir.1992). Unless the hypothetical question
> comprehensively describes the limitations on a claimant's
> ability to function, a vocational expert will be unable to
> accurately assess whether jobs do exist for the claimant.
> Testimony elicited by hypothetical questions that do not
> relate with precision all of a claimant's impairments cannot
> constitute substantial evidence to support the Secretary's
> decision. Ekeland v. Bowen, 899 F.2d 719, 722 (8th Cir.1990).

Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994). The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole. Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir.1994). And a hypothetical question need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the concrete consequences of those impairments. Roe v. Chater, 92 F.3d 672, 67677 (8th Cir. 1996).

In this case, the ALJ asked the VE two hypothetical questions, only the first of which relates to plaintiff's argument. The first asked the VE to assume a hypothetical person with Orr's age, education, and work experience and who was limited to simple and repetitive work which did not require binocular vision. The VE responded that such a person could perform assembler jobs at the sedentary and medium levels. (Tr. 311-12.)[11] In Newton v. Chater, 92 F.3d 688 (8th Cir. 1996), the court indicated that the VE should not be expected to know from the record the full extent of the claimant's limitations, which were not included in the ALJ's hypothetical question. 92 F.3d at 695. It was not enough for the ALJ to hypothesize to the VE only that the claimant was limited to "simple jobs." Id.

---

[11]The only other hypothetical question the ALJ asked the VE, after reviewing briefly a procedural matter, involved assuming the findings in the report of psychiatrist Jothika Manepalli, M.D. In response to that question, which concluded with "With those limitations, would competitive employment be possible?", the VE testified, "It would not be, Your Honor." (Tr. 313-14.)

However, the Eighth Circuit came to an apparently contrary conclusion in <u>Howard v. Massanari</u>, 255 F.3d 577, 583 (8th Cir. 2001). Its holding is described above at p. 17. The undersigned concludes that <u>Howard</u> is appropriately applied to this case. Given the extent to which the ALJ found Orr's asserted limitations not credible, and given the extent to which the ALJ found other record evidence of what Orr could do credible, as set out on pages 8 and 9 of the ALJ's opinion (Tr. 18-19), the ALJ determined that Orr was capable of doing at least "simple, repetitive tasks." The ALJ chose that less demanding grouping of jobs to hypothesize to the VE and the VE testified that Orr could perform them.

Based upon this record, the undersigned concludes that the testimony of the VE that there were other jobs plaintiff could perform in the economy was substantial evidence to support the denial of benefits by the ALJ.

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have ten days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.


        /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on January 30, 2009.